# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CHRISTOPHER KOSCHO,    )
   )
      Plaintiff,    )
     v.    )   C.A. No. N24C-12-106 PAW CCLD
   )
THE MERIT DISTRIBUTION    )
GROUP, LLC and CZECH ASSET    )
MANAGEMENT, L.P.,    )
   )
      Defendants.    )

Submitted: June 20, 2025
Decided: September 29, 2025

## <u>MEMORANDUM OPINION</u>

*Upon Consideration of Defendant The Merit Distribution Group, LLC's Motion to Dismiss Count I and Defendant Czech Asset Management, L.P.'s Motion to Dismiss Counts III and IV*;

## GRANTED.

Jonathan M. Stemerman, Esq.; Glen H. Waldman, Esq.; and Jeffrey R. Lam, Esq., of Armstrong Teasdale LLP, *Attorneys for Plaintiff Christopher Koscho.*

Lauren K. Neal, Esq.; and Sarah Carnahan, Esq., of Morris, Nichols, Arsht & Tunnell LLP; Alexandra Peurach, Esq., of Alston & Bird LLP, *Attorneys for Defendant The Merit Distribution Group, LLC.*

Rebecca L. Butcher, Esq.; and Howard W. Robertson IV, Esq., of Landis Rath & Cobb LLP, *Attorneys for Defendant Czech Asset Management, L.P.*

**WINSTON, J.**

## I.    <u>INTRODUCTION</u>

Plaintiff initiated this litigation against the company for which he used to work and the private credit manager that controls it. After the private credit manager took control, the company terminated plaintiff's employment. Plaintiff asserted that he was entitled to benefits under two agreements with the company. The company refused to pay those benefits, and plaintiff brought suit. Against the company, the Complaint alleges two counts of breach of contract, one relating to an Employment Agreement (Count I), the other to a Transaction Benefit Agreement (Count II). Against the controller, the Complaint alleges two counts of tortious interference with those contracts (Counts III and IV).

The company moves to dismiss Count I, and the controller moves to dismiss Counts III and IV, each motion under Superior Court Civil Rule 12(b)(6). For the reasons discussed below, the motions are **GRANTED**. Plaintiff fails to plead a breach of the Employment Agreement because he failed to sign a release, which was a condition precedent to the company's obligation to pay the benefits he seeks. Although plaintiff signed a modified version of the release, that version was not "substantially in the form" of the release attached to the Employment Agreement, as contractually required. Plaintiff also fails to plead that the controller tortiously interfered with either of the two contracts because the Complaint lacks facts sufficient to overcome the "affiliate privilege," which requires Plaintiff to plead bad

2

faith. Only Count II, for breach of the Transaction Benefit Agreement against the company, remains.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.     THE EMPLOYMENT AGREEMENT

Defendant Merit Distribution Group, LLC ("Merit" or the "Company") hired plaintiff Christopher Koscho to serve as its Chief Executive Officer pursuant to an Employment Agreement dated as of January 16, 2023 (the "Employment Agreement").[2]

Section 5 of the Employment Agreement sets forth the term of Koscho's employment.[3] Section 5(a) provides the circumstances in which Koscho's employment period would end.[4] Section 5(d) provides that in two of those circumstances—"termination by the Company at any time without Cause" under Section 5(a)(iii) or "resignation by [Koscho] with Good Reason" under Section 5(a)(iv)—Koscho is entitled to receive certain benefits from the Company.[5] In full, Section 5(d) provides:

---

[1] The facts are drawn from the Complaint and the documents incorporated therein. The Court accepts as true the well-pled facts in the Complaint solely for the purposes of defendants' motions to dismiss.

[2] Compl. ¶ 8; *see also* Compl., Ex. A (hereinafter "Employment Agreement").

[3] Compl. ¶ 12.

[4] Employment Agreement § 5(a).

[5] *Id.* § 5(a), (d).

3

If the Employment Period is terminated pursuant to Section 5(a)(iii) or Section 5(a)(iv), [Koscho] shall be entitled to receive from the Company:

(i)     The Accrued Benefits;

(ii)    Subject to compliance with Section 5(f), the Prior Year Bonus; and

(iii)   Subject to compliance with Section 5(f), for a period of twelve (12) months (the "Severance Period"), (A) continued payment of [Koscho's] Base Salary (the "Severance Payments"), payable in regular installments in accordance with the Company's general payroll practices; and (B) an amount sufficient, on an after-tax basis, to cover [Koscho's] premium for family coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA Coverage"), payable over the Severance Period, unless during such period, [Koscho] undertakes employment which provides [Koscho] with access to group health plan coverage that is substantially equivalent or better than the group health plan coverage to which [Koscho] is entitled under the COBRA Coverage, in which case, all such payments shall terminate as of the first day of the month on which [Koscho] is eligible to participate in the group health plans of [Koscho's] new employer (the "COBRA Subsidy").[6]

Section 5(f) sets forth conditions precedent to Koscho's entitlement to three of the benefits listed in Section 5(d), namely: (1) the Prior Year Bonus, (2) the

---

[6] *Id.* § 5(d).

Severance Payments, and (3) the COBRA Subsidy (together, the "Disputed Severance Benefits").[7] Specifically, Section 5(f) provides:

> To be eligible for the Prior Year Bonus, the Severance Payments and the COBRA Subsidiary set forth in Section 5(d), [Koscho] must meet the following conditions:
>
> (i) Within thirty (30) days following termination, [Koscho] (or his estate, as applicable) must promptly sign, not revoke, and continue to honor an employment separation and release, substantially in the form attached as Exhibit A (the "Release");
>
> (ii) [Koscho's] compliance with this Section (and the expiration of the seven-day revocation period required by the Older Workers Benefit Protection Act, or any similar mandatory revocation or waiting period, if applicable) shall be a condition to the Company's obligation to make any Severance Payment under this Agreement; and
>
> (iii) [Koscho] must comply with his continuing obligations under this Agreement and any similar agreements with the Company and its Subsidiaries. Should [Koscho] fail to comply with this Section, [Koscho] shall receive no further amounts under Section 5(d) of this Agreement.[8]

---

[7] *Id.* § 5(f). Section 5(f) refers to the "COBRA Subsidiary." No party disputes that this is a typo meant to refer to the COBRA Subsidy.

[8] *Id.* § 5(f).

As referenced in Section 5(f)(i), the Employment Agreement attaches, as Exhibit A, an unexecuted document titled "GENERAL RELEASE" (the "Exhibit A Release").[9] The Exhibit A Release reads, in part:

> Except as provided in Section 3 below, I knowingly and voluntarily (for myself, my heirs, executors, administrators and assigns) release and forever discharge the Company and the other Released Parties from any and all claims, causes of action, cross-claims, counter-claims, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date on which I sign this General Release) and whether known or unknown, including, but not limited to, any allegation, claim or violation arising under or for: breach of contract; Title VII; the Age Discrimination in Employment Act as amended (including the Older Workers Benefit Protection Act); the Americans with Disabilities Act; the Employee Retirement Income Security Act; their state and/or local counterparts; or under any other federal, state, common or local law or theory (the "Claims"). I represent that I have made no assignment or transfer of any released claims.[10]

**B.    KOSCHO AND THE COMPANY ENTER INTO A TRANSACTION BONUS AGREEMENT AFTER CAM EXPRESSES INTEREST IN TAKING OVER.**

About one year after he was hired, Koscho learned that Czech Asset Management, L.P. ("CAM"), a private credit manager, was interested in taking over the Company.[11] Koscho began having discussions with the directors of Merit—including CAM, which had a representative on Merit's Board—in which Koscho

---

[9] Employment Agreement, Ex. A (hereinafter "Exhibit A Release").

[10] Exhibit A Release § 2.

[11] Compl. ¶ 15.

made clear he did not want to work for a lender-owned company such as CAM.[12]

Consistent with these discussions, Koscho and Merit negotiated an arm's-length transaction in the event there was change in control of Merit.[13] On June 27, 2024, Koscho and Merit entered into the Transaction Bonus Agreement (the "TBA").[14]

The TBA provides, subject to certain terms and conditions, that Kosho would be entitled to receive a "Transaction Bonus" from Merit in the event of a "Change of Control" of the Company.[15] Under Section 1 of the TBA, "the Transaction Bonus shall be payable within (7) days after the Closing of the Change of Control."[16]

## C.  CAM TAKES CONTROL OF MERIT, THE COMPANY TERMINATES KOSCHO, AND CONTRACTUAL DISPUTES ARISE.

In October 2024, CAM took control of Merit's Board.[17] The next month, the Company terminated Koscho's employment.[18]

After Koscho's termination, CAM "attempted to have" Koscho sign a new document titled "SEPARATION AGREEMENT AND RELEASE" (the "CAM

---

[12] *Id.* ¶ 18, 22.

[13] *Id.* ¶ 19.

[14] *Id.* ¶ 20; *see also* Compl., Ex. B (hereinafter "TBA").

[15] TBA § 1.

[16] *Id.*

[17] Compl. ¶ 24.

[18] *Id.* ¶ 25.

Release").[19]  The CAM Release differed from the Exhibit A Release, including because it would have released not only Merit, but also CAM, from all claims.[20]  In return for signing the CAM Release, Koscho would receive severance benefits.[21]  Koscho alleges that he was already entitled to severance benefits under the Employment Agreement and therefore refused to sign this "self-serving document prepared by CAM."[22]

By mid-November, Merit had paid neither the Disputed Severance Benefits under the Employment Agreement nor the Transaction Bonus under the TBA.[23]  At that time, Koscho sent a Notice of Default to Merit, with a copy to CAM, regarding the Company's alleged failure to comply with the TBA.[24]  A few days later, Koscho sent the Company an executed modified version of the Exhibit A Release (the "Modified Release").[25]  The Modified Release differed from the Exhibit A Release in one respect—specifically, at the end of Section 2, which sets forth the scope of

---

[19] *Id.* ¶ 26; Pl.'s Ans. Br. in Opp'n to Def. Czech Asset Management, L.P.'s Mot. to Dismiss Count III and Count IV of the Compl. (D.I. 20) (hereinafter "Ans. Br. to CAM's Mot."), Ex. 1.

[20] Compl. ¶ 26.

[21] *Id.*

[22] *Id.*

[23] *Id.* ¶¶ 27, 38.

[24] *Id.* ¶ 28.

[25] Compl. ¶ 29; Def.'s Op. Br. in Support of Mot. to Dismiss Count I of the Compl. (D.I. 15) (hereinafter "Merit Op. Br."), Ex. 1 (hereinafter "Modified Release") § 2.

the released claims, Koscho added a sentence: "The released Claims are related solely to the Agreement and, in any event, do not include claims related to The Transaction Bonus Agreement dated June 27, 2024."[26] Koscho alleges that the executed release he sent entitled him to benefits including the Disputed Severance Benefits.[27]

Merit has notified Koscho it will not pay any benefits to him under the Employment Agreement and has not paid the Transaction Bonus under the TBA.[28]

---

[26] Modified Release § 2. The Court may consider the Modified Release on the present motions because it was incorporated by reference into and is integral to the Complaint. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 817-18 (Del. 2013); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) ("The incorporation-by-reference doctrine permits a court to review the actual document to ensure that the plaintiff has not misrepresented its contents and that any inference the plaintiff seeks to have drawn is a reasonable one." (citations omitted)), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). Moreover, no party objects to the Court's consideration of the Modified Release. Merit attached the Modified Release as Exhibit 1 to its opening brief, and Koscho in his answering brief cited Merit's opening brief Exhibit 1 as the release that he contends "entitl[es] him to" the Disputed Severance Benefits. *See* Pl.'s Ans. Br. in Opp'n to Def. The Merit Distribution Group, LLC's Mot. to Dismiss Count I of the Compl. (D.I. 21) (hereinafter "Ans. Br. to Merit's Mot.") at 4-5.

[27] Compl. ¶ 29.

[28] *Id.* ¶¶ 30, 38, 44.

**D.    PROCEDURAL HISTORY**

Koscho initiated this action by filing his Complaint on December 16, 2024.[29] Merit filed a motion to dismiss Count I,[30] and CAM filed a motion to dismiss Counts III and IV.[31] Koscho filed two answering briefs, one in opposition to Merit's motion and one in opposition to CAM's motion,[32] and Merit and CAM each filed reply briefs.[33] The Court heard oral argument on June 20, 2025 and reserved its decision.

## III.    <u>STANDARD OF REVIEW</u>

Upon a Rule 12(b)(6) motion, the Court: (i) accepts all well-pleaded factual allegations as true; (ii) credits vague allegations if they give the opposing party notice of the claim; (iii) draws all reasonable inferences in favor of the non-moving party; and (iv) denies dismissal if recovery on the claim is reasonably conceivable.[34] The Court does not, however, accept conclusory allegations unsupported by the facts or draw unreasonable inferences in favor of the nonmovant.[35]

---

[29] *See generally* Compl.

[30] D.I. 15.

[31] D.I. 16.

[32] D.I. 20; D.I. 21.

[33] D.I. 23; D.I. 24.

[34] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldg., LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002)).

[35] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (citing *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1160 (Del. 2010)).

## IV.  ANALYSIS

Koscho's Complaint brings two counts for breach of contract against Merit: one for breach of the Employment Agreement (Count I), the other for breach of the TBA (Count II).[36]  The Complaint also brings two counts for tortious interference with contract against CAM, relating to the Employment Agreement (Count III) and the TBA (Count IV).[37]

Merit moves to dismiss the claim for breach of the Employment Agreement but not the claim for breach of the TBA.  CAM moves to dismiss both claims for tortious interference.  The Court first addresses Merit's argument that the Complaint fails to state a claim for breach of the Employment Agreement.  Then, the Court addresses CAM's arguments that the Complaint fails to state a claim for tortious interference with either agreement.

### A.  COUNT I IS DISMISSED; UNDER THE UNAMBIGUOUS TERMS OF THE EMPLOYMENT AGREEMENT, KOSCHO FAILED TO SATISFY A CONDITION PRECEDENT TO THE DISPUTED SEVERANCE BENEFITS.

In Count I, Koscho alleges that Merit breached the Employment Agreement by failing to pay him the Disputed Severance Benefits following his termination.[38]  Merit argues that Koscho is not entitled to the Disputed Severance Benefits because

---

[36] *See* Compl. ¶¶ 33-45.

[37] *See id.* ¶¶ 46-63.

[38] *See id.* ¶¶ 29-31, 33-39.

11

he failed to satisfy a condition precedent to them—namely, that Koscho sign a release "substantially in the form" of the Exhibit A Release.[39] The parties do not dispute that this is a condition precedent,[40] meaning that if Koscho did not satisfy it, then Merit was not obligated to perform and did not breach the contract.[41] Nor do the parties dispute that, to the extent Koscho signed a release, it was only the Modified Release, which differed from the Exhibit A Release.[42] The only dispute is whether the Modified Release was "substantially in the form" of the Exhibit A Release, as required by the condition precedent. Merit contends that it was not, as a matter of law.[43] Koscho asserts that the dispute raises an issue of fact that the Court cannot resolve at this stage.[44]

"[T]he proper interpretation of language in a contract is a question of law" which may be decided on a motion to dismiss.[45] Dismissal is warranted where the

---

[39] *See* Merit Op. Br. at 11.

[40] *See id.* at 1; *see generally* Ans. Br. to Merit's Mot.

[41] *See Roth v. Sotera Health Co.*, 2024 WL 4260649, at *10 (Del. Ch. Sept. 23, 2024) ("A condition precedent 'must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies.'" (quoting 13 Williston on Contracts § 38:7 (4th ed.) (Westlaw, May 2024 Update))).

[42] *See* Merit Op. Br. at 7; Ans. Br. to Merit's Mot. at 4.

[43] *See* Merit Op Br. at 2-3, 11.

[44] *See* Ans. Br. to Merit's Mot. at 1, 6.

[45] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (citing *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006)).

contract's terms are unambiguous and support the movant.[46] "To determine whether the contract is unambiguous, Delaware 'adheres to the objective theory of contracts.'"[47] That means the Court will "interpret a particular contractual term to mean 'what a reasonable person in the position of the parties would have thought it meant.'"[48] The Court must "read [the] contract as a whole and . . . give each provision and term effect."[49] The Court will grant a motion to dismiss where "the movant's interpretation is 'the only reasonable construction as a matter of law.'"[50]

The dispute here requires the Court to interpret contract language, specifically, the language "substantially in the form." It appears that Delaware courts have not had occasion to interpret this language in the present context of comparing a contractual release to a modified version of it.[51] Accordingly, the Court

---

[46] *See Maka v. Musial*, 2025 WL 1744936, at *3 (Del. Super. June 11, 2025).

[47] *Vinton v. Grayson*, 189 A.3d 695, 704 (Del. Super. 2018) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[48] *Id.* at 699 (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006)).

[49] *Osborn*, 991 A.2d at 1159.

[50] *Seaworld Entm't, Inc. v. Andrews*, 2023 WL 3563047, at *3 (Del. Ch. May 19, 2023) (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)), *aff'd*, 314 A.3d 662 (Del. 2024) (TABLE).

[51] *Roth* involved nearly identical language in a very similar context, where a former officer was required to sign a release to be entitled to severance benefits. 2024 WL 4260649, at *10. But in *Roth*, the former officer did not sign *any* release. *Id.* The Court of Chancery thus did not need to determine whether a modified version of a release was "in substantially the form" of the release attached to the contract. *Id.*

looks to dictionary definitions[52] and caselaw interpreting similar language. Itself consulting dictionaries, the Court of Chancery observed that "substantial" means, among other things, "being largely but not wholly that which is specified."[53] The court observed further that "[s]ubstantially conveys the same meaning as 'considerably' and 'essentially' because it means 'to a great extent or degree' and communicates that it is very nearly the same thing as the noun it acts upon."[54] Black's Law Dictionary defines "substantial" as, among other things, "[o]f, relating to, or involving substance; material," "[i]mportant, essential, and material; of real worth and importance," and "[c]ontaining the essence of a thing; conveying the right idea even if not the exact details."[55] "In all their relevant meanings," the Court of Chancery has observed, "substantial and substantially convey the idea of amplitude,

---

[52] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 339 (Del. 2022) ("[T]his Court 'often looks to dictionaries to ascertain a term's plain meaning.'" (quoting *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020))).

[53] *Hollinger Inc. v. Hollinger Int'l, Inc.,* 858 A.2d 342, 377 (Del. Ch. 2004) (quoting Merriam-Webster On-Line Dictionary, http://www.m-w.com) (analyzing the meaning of "substantially all" under 8 *Del. C.* § 271 concerning the stockholder approval required for a sale of "all or substantially all" of a corporation's assets), *appeal refused*, 871 A.2d 1128 (Del. 2004) (TABLE).

[54] *Id.* at 377 (first quoting MSN Encarta Dictionary, http://encarta.msn.com/encnet/features/dictionary/dictionaryhome.aspx; and then quoting http://www.dictionary.reference.com).

[55] *Substantial*, Black's Law Dictionary (12th ed. 2024).

14

of something that is '[c]onsiderable in importance, value, degree, amount, or extent.'"[56]

It is also worth noting that, because these meanings of "substantial" evoke comparisons between things, the proper criteria for comparison will depend on the types of things being compared. In considering whether one apple is "substantially similar to" or "substantially in the form" of another apple, for example, one might properly consider the apples' size, color, smell, taste, texture, or number of bruises. None of those criteria are relevant when comparing contracts; a contract itself is intangible, and the Court does not need to feel the texture of the paper on which a contract is written, much less taste it. More relevant will be the scope of rights and obligations that the contracts establish. And, zooming in further, which rights and obligations are most important may depend on the type of contract and the context of the parties' bargain.

In sum, for the Modified Release to be "substantially in the form" of the Exhibit A Release, the two must, at least, contain the same essence and not differ in important or considerable ways. And when determining what is "essential" and what differences are "important" or "considerable," the Court takes into account that it is

---

[56] *Hollinger*, 858 A.2d at 377 (citing American Heritage Dictionary 1727 (4th ed. 2000)).

comparing contractual releases. Based on these considerations, the Modified Release is not "substantially in the form" of the Exhibit A Release.

The Exhibit A Release is a general release. It is titled as such and purports to "release and forever discharge the Company and the other Released Parties from any and all claims, causes of action, cross-claims, counter-claims, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date on which I sign this General Release) and whether known or unknown, including, but not limited to" several examples.[57] As a general release, the Exhibit A Release was "intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind."[58] Such a general release is "designed to provide 'complete peace.'"[59]

The Modified Release differs from the Exhibit A Release in an important and considerable respect, and the two releases do not contain the same essence. True, the Modified Release only "added one sentence" to the Exhibit A Release,[60] but in

---

[57] Exhibit A Release § 2; *see Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 333, 335 (Del. 2012) (holding similarly broad language constituted general release).

[58] *Corp. Prop. Assocs. 6 v. Hallwood Grp. Inc.*, 817 A.2d 777, 779 (Del. 2003) (quoting *Hob Tea Room v. Miller*, 89 A.2d 851, 856 (Del. 1952)).

[59] *See Seven Invs., LLC v. AD Capital, LLC*, 32 A.3d 391, 397 (Del. Ch. 2011) (quoting *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1137 (Del. 2008)).

[60] *See* Ans. Br. to Merit's Mot. at 10.

16

the contractual context, one sentence, even one word, can make all the difference.[61]

The sentence Koscho added is important. At the end of Section 2, which sets forth the scope of the release, Koscho added: "The released Claims are related solely to the Agreement and, in any event, do not include claims related to The Transaction Bonus Agreement dated June 27, 2024."[62] In other words, whereas the Exhibit A Release covers all claims to provide a complete peace between the parties, the Modified Release does not cover all claims and does not provide assurance of a complete peace. A general category of claims, those that are not "related solely to the Agreement," as well as a more specific category, those "related to [t]he [TBA]," were carved out. The Modified Release's change strikes at the core purpose of the Exhibit A Release. The two releases are not considerably or essentially the same.

To avoid this result, Koscho argues that because "substantial" is "not an absolute term" and "can be ambiguous," interpreting it here requires a determination of fact that the Court cannot make on this motion.[63] The Court is not persuaded. Koscho is right that "substantial," like many other words, can be ambiguous in some

---

[61] For an illustration of the difference a single word can make, consider what happens when "not" is added to almost any contract provision, such as the italicized in the following: "I do *not* release all claims." This is not to say that adding a single word or sentence to a contract will always result in an important or considerable change. That will depend on the word or sentence, as well as the words directly around it and the contract as a whole.

[62] Modified Release § 2.

[63] *See* Ans. Br. to Merit's Mot. at 10.

17

contexts. But the Court is not required to determine and apply the meaning of "substantial" in all contexts; it is required to determine if, based on the contract and claims at issue in this case, there is a reasonable interpretation under which the plaintiff can recover.[64] Koscho has not offered such an interpretation, and the Court does not know of one.[65] No reasonable person would consider the Modified Release, which materially narrowed the scope of the released claims, to be "substantially in the form" of the general Exhibit A Release. Accordingly, Koscho has failed to satisfy the condition precedent to his receipt of the Disputed Severance Benefits, and his claim for breach of the Employment Agreement is dismissed.

The Court, therefore, **GRANTS** Merit's motion to dismiss Count I.[66]

---

[64] *See Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1043 (Del. 2023) (explaining that "[i]n giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract" and that "[l]anguage is ambiguous if it is susceptible to more than one reasonable interpretation" (citations omitted)); *Winshall*, 76 A.3d at 813 (explaining that dismissal is appropriate if complaint does not "allege[] a reasonably conceivable set of facts under which the plaintiff would be entitled to relief" (citation omitted)).

[65] Koscho offered two definitions of "substantial": "[c]ontaining the essence of a thing; conveying the right idea even if not the exact details," and "being largely but not wholly that which was specified." Ans. Br. to Merit's Mot. at 8 (first quoting *Substantial*, Black's Law Dictionary (12th ed. 2024); and then quoting *Substantial*, Merriam-Webster, https://www.merriam-webster.com/dictionary/substantial (last accessed Mar. 24, 2025)). But the Court considered those definitions above and, even under them, no reasonable person would consider the Modified Release to be "substantially in the form" of the Exhibit A Release.

[66] It is unclear whether Count I seeks payment of only the Disputed Severance Benefits or also the "Accrued Benefits." The Complaint references Employment Agreement Section 5(d), which provides that, under certain circumstances, Koscho

18

**B.** **COUNTS III AND IV ARE DISMISSED; THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE BECAUSE IT DOES NOT ALLEGE FACTS TO OVERCOME THE AFFILIATE PRIVILEGE.**

Counts III and IV are claims for tortious interference with contract against CAM. Count III relates to the Employment Agreement, Count IV to the TBA. At the outset, Count III can be dismissed because, as held above, the Complaint fails to plead a breach of the Employment Agreement that underlies it.[67] Nonetheless, because the law and many of the facts underlying Counts III and IV overlap, the Court addresses additional arguments regarding both counts together below.

To state a claim for tortious interference with contract, a plaintiff must plead five elements: "(1) a valid contract; (2) about which defendants knew; (3) an intentional act that is a significant factor in causing the breach of such contract; (4)

---

would be entitled to not only the Disputed Severance Benefits, but also the Accrued Benefits. *See* Compl. ¶ 13. Although the Complaint focuses on the Disputed Severance Benefits, it leaves open that it may also seek other benefits under the Employment Agreement. *See, e.g.*, *id.* ¶ 35 (alleging that Koscho "was entitled to certain benefits upon his termination without cause *including* [the Disputed Severance Benefits]" (emphasis added)). Merit moved to dismiss Count I on grounds that Koscho failed to satisfy the condition precedent in Section 5(f), but that condition precedent does not appear to apply to the Accrued Benefits. *See* Employment Agreement § 5(f). The parties did not brief whether Count I seeks the Accrued Benefits or, if it does, whether it states a claim to receive them. Accordingly, only to the extent it seeks the Accrued Benefits, Count I is dismissed without prejudice.

[67] *See, e.g.*, *Buck v. Viking Hldg. Mgmt. Co. LLC*, 2021 WL 673459, at *5 (Del. Super. Feb. 22, 2021) ("As explained, [plaintiff] has not sufficiently pleaded an underlying breach of the [contract]. That alone precludes [plaintiff] from maintaining the associated tortious interference claim.").

19

without justification; (5) which causes injury."[68]  CAM's motion to dismiss challenges two of these elements: "justification" and "intentional act."[69]  Here, the "justification" element is dispositive.

CAM argues that the Complaint's tortious interference claims are barred by the "affiliate privilege" doctrine.[70]  That doctrine "shields an affiliate from primary or vicarious tort liability for the breach of a contract to which the affiliate itself was not a signatory."[71]  Courts assess the affiliate privilege under the "justification" element because the doctrine balances value judgments about when a corporate parent is "justified" in interfering with its subsidiary.[72]  The privilege arises from a

---

[68] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 605 (Del. Ch. 2010) (quoting *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.7 (Del. 2005)).

[69] *See* Opening Br. in Support of Czech Asset Mgmt., L.P.'s Mot. to Dismiss Counts III and IV of the Compl. (D.I. 16) (hereinafter "CAM Op. Br.") at 7.

[70] *See id.* at 7.

[71] *Buck*, 2021 WL 673459, at *6 (citing *Surf's Up Legacy P'rs, LLC v. Virgin Fest*, 2021 WL 117036, at *7 (Del. Super. Jan. 13, 2021); *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013); *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994)).

[72] *See, e.g.*, *id.* at *6 (applying privilege as a "presumption that any interference [the corporate affiliate] may have undertaken was justified economically"); *Surf's Up*, 2021 WL 117036, at *6 (explaining that privilege arises from "balanc[ing] important policies" to "evaluat[e] whether a controller's interference was 'unjustified'"); *Shearin*, 652 A.2d at 589-90 & n.13 (explaining that an intentional interference claim "inevitably involve[s] a complex normative judgment relating to justification" and that "the close economic relationship of related entities requires enhanced latitude in defining what 'improper' interactions would be" (citation omitted)).

presumption that a corporate parent is "'pursuing its legitimate profit seeking' interests 'in good faith.'"[73] But that presumption, and thus the privilege it underlies, are not absolute.[74] At the pleading stage, the plaintiff may rebut the privilege by "alleg[ing] facts that support a reasonable inference that the interference was 'motivated by some malicious or other bad faith purpose' rather than 'to achieve permissible financial goals.'"[75]

Under Delaware law, pleading bad faith is generally a high bar.[76] So too in the affiliate privilege context, where "courts are reluctant to find bad faith because affiliate interference often is a legitimate business strategy."[77] Courts have found bad faith adequately pled where the controller took action that harmed the subsidiary in some way, such as by rendering it insolvent or decreasing its value.[78]

---

[73] *Surf's Up*, 2021 WL 117036, at *7 (quoting *Shearin*, 652 A.2d at 591).

[74] *Id.* at *1, *7.

[75] *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *27 (Del. Ch. Oct. 7, 2019) (quoting *Shearin*, 652 A.2d at 591).

[76] *See, e.g.*, *In re Trade Desk, Inc. Derivative Litig.*, 2025 WL 503015, at *22 (Del. Ch. Feb. 14, 2025) (explaining that, in the corporate fiduciary duty context, pleading bad faith is "no easy task").

[77] *Buck*, 2021 WL 673459, at *6; *Allied Capital*, 910 A.2d at 1039 (noting that the bad faith standard is "stringent").

[78] *See, e.g.*, *Surf's Up*, 2021 WL 117036, at *9 (citing examples of cases that "involved insolvent breaching parties in which a controlling entity *was alleged* to have forced their insolvency by siphoning the breaching parties' assets and arrogating those assets to itself"); *Bandera*, 2019 WL 4927053, at *27 (holding bad faith adequately pled because complaint alleged general partner took action "to drive down the price of [the partnership's] common units" to benefit itself); *AM Gen.*

Here, Koscho agrees that CAM controlled Merit,[79] so the affiliate privilege will apply unless the Complaint pleads facts to support an inference of bad faith. The Complaint does not do so. It alleges only that CAM knew of the relevant agreements, sought to obtain a broad release for both itself and the Company, and "tried to have Koscho tear up the TBA and waive his rights thereunder."[80] Obtaining waivers of Koscho's rights, under the TBA or more broadly, would be to the Merit's benefit, not detriment, because it could relieve Merit of potential liabilities. And although the Complaint states that CAM engaged in "self-dealing" by seeking a waiver for itself as well,[81] it does not plead facts to support this contention or show how Merit was harmed.[82] Nor does the Complaint plead facts to suggest that CAM was motivated to harm Koscho rather than to advance Merit's and CAM's joint

---

*Hldgs. LLC v. Renco Grp., Inc.*, 2013 WL 5863010, at *13 (Del. Ch. Oct. 31, 2013) (citing further examples).

[79] *See* Compl. ¶¶ 24-25, 49, 62; Ans. Br. to CAM's Mot. at 10 ("Plaintiff has alleged that CAM had control of the Company and used its position to interfere with the valid agreement between the Company and Koscho.").

[80] Compl. ¶¶ 22, 26, 48, 51, 57-58.

[81] *Id.* ¶ 51.

[82] *MHC IV, LLC v. TCFIV Venturi Buyer P, LLC*, 2024 WL 5183211, at *4 (Del. Super. Dec. 19, 2024) ("Conclusory allegations . . . are insufficient to overcome the presumption the controllers were acting in good faith to maximize joint profits." (citing *Nivagen Pharm., Inc. v. Hikma Pharm. USA Inc.*, 2024 WL 1576519, at *4 (Del. Super. Apr. 11, 2024))); *Buck*, 2021 WL 673459, at *4 ("The Court need not strain to read an untold narrative into the complaint." (citing *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001))).

business interests.  Absent factual allegations about CAM's motivations or acts that harmed Merit, the Complaint cannot support an inference of bad faith.

Because the Complaint lacks any facts from which it could be inferred that CAM acted in bad faith, the affiliate privilege applies, and Koscho has failed to plead the "justification" element of tortious interference.[83]  The Court therefore **GRANTS** CAM's motion to dismiss Koscho's tortious interferences claims (Counts III and IV).[84]

## V.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Merit's and CAM's motions to dismiss Counts I, III, and IV of the Complaint.

**IT IS SO ORDERED.**

                                                                    /s/ Patricia A. Winston
                                                                    **Patricia A. Winston, Judge**

---

[83] Koscho argues that, as a general matter, the Court cannot grant dismissal because the affiliate privilege is an affirmative defense that cannot be decided at the pleading stage.  *See* Ans. Br. to CAM's Mot. at 10-11.  But that argument ignores the long line of cases dismissing tortious interference claims based on the affiliate privilege.  *See, e.g.*, *Buck*, 2021 WL 673459, at *7; *Surf's Up*, 2021 WL 117036, at *9; *AM Gen. Hldgs.*, 2013 WL 5863010, at *14.

[84] Because Koscho failed to plead the "justification" element, the Court need not reach CAM's additional argument for dismissal under the "intentional act" element. *See* CAM Op. Br. at 13-15.